**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CIVIL NO. _____** |
| | * | |
| **REAL PROPERTY LOCATED IN** | * | |
| **POTOMAC, MARYLAND,** | * | |
| **COMMONLY KNOWN AS 9908** | * | |
| **BENTCROSS DRIVE, POTOMAC, MD** | * | |
| **20854 AND ALL APPURTENANCES,** | * | |
| **IMPROVEMENTS, AND** | * | |
| **ATTACHMENTS LOCATED** | * | |
| **THEREON, AND ANY PROPERTY** | * | |
| **TRACEABLE THERETO,** | * | |
| | * | |
| **Defendant *In Rem*.** | * | |
| | * | |
| | ******* | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, by and through its undersigned attorneys, in a case of forfeiture *in rem*, alleges in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

## NATURE OF THE ACTION

1.      This is a civil action *in rem* brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C) seeking forfeiture of all right, title, and interest in the following property to the United States:

> Real property located in Potomac, Maryland, commonly known as 9908 Bentcross Drive, Potomac, MD 20854 and all appurtenances, improvements, and attachments located thereon, and any property traceable thereto

(the "Defendant Property").  The Defendant Property was acquired with proceeds derived from illicit bribes and stolen public funds misappropriated by the former President of Gambia, YAHYA

JAMMEH ("JAMMEH") and his wife, ZINEB JAMMEH ("ZINEB") in violation of U.S. and Gambian law. In summary, through a trust established by ZINEB, JAMMEH and ZINEB purchased the Defendant Property—a multimillion dollar mansion located in Potomac, Maryland—using funds acquired through illicit means, including theft from his own people and by receiving bribes from numerous businessmen operating in The Gambia during the years he was in power.

2.    As property constituting, derived from, or traceable to the proceeds of "specified unlawful activity," as that term is defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit "specified unlawful activity," and as property involved in money laundering violations of 18 U.S.C. §§ 1956 and 1957, the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C).

3.    JAMMEH came to power in The Gambia through a military coup in 1994 and continued as the country's authoritarian ruler until January 2017. While in power, JAMMEH corruptly obtained millions of dollars through the embezzlement of public funds and the solicitation of bribes from businesses seeking to obtain monopoly rights over various sectors of the Gambian economy. JAMMEH conspired with his family members and close associates to launder his corrupt proceeds throughout the world, including through the purchase of the Defendant Property.

4.    Upon losing the Presidential election in December 2016, JAMMEH initially refused to transfer power. Only after coming under extensive international pressure did JAMMEH leave office, fleeing with his family and close associates and significant assets to Equatorial Guinea, where, upon information and belief, he and his wife ZINEB remain.

5.      The JAMMEH regime was notorious for both public corruption and human rights violations. Upon JAMMEH's removal from power, the newly elected government of The Gambia, aided by the international community, including the United States, began taking steps to formally investigate, document, publicize and redress the JAMMEH regime's widespread corruption and human rights violations and to, where possible, bring individuals to justice and return assets stolen from the Gambian people.  As part of these efforts, the Gambian government established two separate quasi-judicial commissions, one focused on public corruption, the other on human rights violations.  The investigation into public corruption, formally named the *Commission of Inquiry Into The Financial Activities of Public Bodies, Enterprises and Offices as Regards Their Dealings With Former President Yahya A.J.J. Jammeh And Connected Matters* (the "Janneh Commission" or "Commission") began its work in 2017 and issued its findings in a nine-volume report (the "Commission's Report") issued to the public on September 13, 2019.[1]   The Janneh Commission, so named after the Chairman of the Commission, Sourahata Semega-Janneh, issued the Commission's Report which was then summarized by The Gambia's Ministry of Justice in a separate document entitled, The White Paper.  The Janneh Commission investigated the Jammeh regime's corruption with public testimony and hearings that took place over the course of more than two years.[2]

6.      The Commission's Report "revealed an unprecedented level of corruption and abuse of power and authority by former President Jammeh, his wife, family members and close

---

[1] The Commission's Report is publicly available at https://gainako.com/the-janneh-commission/.

[2] The Gambia also created a second commission to investigate the Jammeh regime's human rights violations, named the Truth, Reconciliation and Reparations Committee ("TRRC"), which began operations in 2019.  The TRRC was commissioned to investigate and make recommendations respecting human rights violations, including torture, disappearances, and extrajudicial killings, committed by the Jammeh regime, and has yet to complete its work.

associates with his full support."  Specifically, the Commission concluded, among other things, that:

a.  JAMMEH lacked the lawful income to support his lifestyle and numerous acquisitions;

b.  JAMMEH wasted, misappropriated, diverted, or simply stole the equivalent of over $300 million U.S. dollars ("USD") from public accounts;

c.  JAMMEH extorted and received millions of dollars in bribes from businessmen, in exchange for granting exclusive contracts and monopoly rights over various aspects of the Gambian economy;

d.  The equivalent of over $2 million USD was improperly diverted from public funds, including from purported children's charities, and transferred to accounts for the personal use of ZINEB Jammeh; and

e.  ZINEB Jammeh is criminally liable for the theft of over $1.6 million in public funds.

7.  The Janneh Commission concluded, and the Ministry of Justice subsequently agreed, that JAMMEH and his associates were criminally liable for violations of numerous sections of The Gambia's Criminal Code, including theft (§ 245) and public corruption offenses including bribery and embezzlement (§§ 360-361).  The Commission also concluded that the purchase of the Defendant Property was more likely than not a violation of The Gambia's Anti Money Laundering Act of 2003.

8.  The Commission identified and explained the roles of a number of close JAMMEH associates who aided and conspired with JAMMEH in his corrupt actions and profited from them. One such associate was Businessman #1.  The Commission identified numerous companies that

Businessman #1 operated in The Gambia.  These companies often obtained exclusive monopoly rights in The Gambia, in exchange for corrupt payments to JAMMEH.  One of Businessman #1's companies, Petroleum Company, was granted a monopoly over all petroleum imports into The Gambia.  The Gambia's Ministry of Justice agreed with the Janneh Commission's conclusion that Businessman #1 "contributed greatly to the near ruin" of The Gambia.  Businessman #1 was found criminally liable for millions of dollars in bribes paid to JAMMEH in violation of Gambian law and his assets in The Gambia were ordered forfeited.  The Commission also recommended that JAMMEH'S extensive properties in The Gambia also be forfeited and that criminal charges be brought against him.

9.    In December 2017, pursuant to the Global Magnitsky Human Rights Accountability Act, the U.S. Department of the Treasury also announced sanctions against JAMMEH, observing that JAMMEH "has a long history of engaging in serious human rights abuses and corruption" including the creation of "a terror and assassination squad called the Junglers" that he used "to threaten, terrorize, interrogate, and kill individuals whom [he] assessed to be threats."  *See* U.S. Department of the Treasury Press Release, Dec. 21, 2017*, available at* https://home.treasury.gov/news/press-releases/sm0243, citing Executive Order 13818 of December 20, 2017, Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption, 82 Fed. Reg. 60839 (Dec. 26, 2017).  The Treasury Department's announcement further observed that JAMMEH "used a number of corrupt schemes to plunder The Gambia's state coffers or otherwise siphon off state funds for his personal gain."

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1355(a).

11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1395(b) because acts and omissions giving rise to forfeiture took place in the District of Maryland and the property is located in the District of Maryland.

12.     This action *in rem* for forfeiture is governed by 18 U.S.C. §§ 981 and 983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

<u>**RELEVANT PERSONS AND ENTITIES**</u>

On information and belief, the United States alleges the following facts.

13.     **The Gambia** is one of the smallest nations on the African continent.  It is located on the West Coast of Africa and is bordered by the Atlantic Ocean on the west and by Senegal to the north, south and east.

14.     **Yahya JAMMEH** ("JAMMEH") is the former President of The Gambia. He became President in 1994 at the age of 29.   He currently resides in exile in Equatorial Guinea.

15.     **ZINEB Suma Jammeh**, also known as Zineb Yahya Jammeh, ("ZINEB") is the wife of Yahya JAMMEH.  ZINEB was recognized as the "First Lady" of The Gambia during JAMMEH's rule and is believed to be currently residing with him in exile in Equatorial Guinea. ZINEB has been implicated in the theft and misappropriation of public funds used to support her luxurious lifestyle.  Her property in The Gambia has been ordered forfeited by the Gambian government and the Commission has recommended that she be criminally prosecuted for her role in the theft and misappropriation of public funds.

16.     **Mariam Yahya Jammeh Family Trust** ("MYJ FAMILY TRUST"):  The MYJ Family Trust is the name used on an account at Trust Bank Limited in The Gambia and purports

to be an account for Mariam Jammeh, the daughter of Ex-President JAMMEH, or for his other children.

17.     **The MYJ Family Revocable Trust** is a trust created by ZINEB Yahya Jammeh on or about September 1, 2009.  The trust document states that the Trustee of the MYJ Family Revocable Trust is ZINEB Yahya Jammeh, with a Successor Trustee listed as Yahya JAMMEH. The trust document was executed on August 8, 2010 and was signed by ZINEB Jammeh.

18.     **Businessman # 1** was a close business associate of JAMMEH.  His companies, including his Petroleum Company, entered into numerous contracts with the Gambian government. The Commission determined that companies controlled by Businessman #1 paid and/or facilitated bribes directly to JAMMEH in excess of $9,000,000.  Businessman #1 also claimed to act on behalf of JAMMEH to bring investors to The Gambia.

19.     **Petroleum Company** was a company controlled by Businessman #1 that was granted exclusive monopoly rights by JAMMEH over all petroleum imports into The Gambia.

20.     **Businessman #2** was introduced by Businessman #1 to JAMMEH in or about 2007. Businessman #2 sought to invest in and provide management and international telephone and internet services to the people of The Gambia using a Telephone and Internet Services Management Firm.

21.     **Telephone and Internet Services Management Firm** was a company which Businessman #1 claimed to have introduced to JAMMEH to invest in The Gambia to provide services including international telephone and internet services to the Gambian people beginning in or about 2007 and purchasing shares of the State-owned Company, GAMTEL.  Its owner/officer, Businessman #2, created a successor company to continue the business for a time

after JAMMEH unilaterally terminated the contract with the first firm.  Businessman #1 continued to function as an intermediary for these companies with JAMMEH.

22.     **Trust Bank Limited** is a bank in Banjul, The Gambia, where the MYJ Family Trust Account was established, for the purpose of purchasing the Defendant Property using funds derived from JAMMEH and his associates.

## STATEMENT OF FACTS

### I.     JAMMEH's Limited Lawful Income

23.     Prior to becoming President of The Gambia, JAMMEH was a lieutenant in the Gambian military where he was paid a minimal salary.

24.     As President of The Gambia at 29 years of age in July 1994, JAMMEH's salary was D2,744.20 (Gambian Dalasi) per month.[3] At today's conversation rates, that salary equates to approximately $53 USD per month or $636 USD per year.

25.     The salary of the President of The Gambia was raised to $911 USD per month in January 2006 or $10,932 USD per year, to $1,492 USD per month for an annual total of $17,904 USD in January 2007 and to $3,295 USD per month for an annual total of $39,540 USD from January 2008 to December 2014.

26.     According to publicly available information, in 2019 the salary of the current President of Gambia is a modest $65,000 USD per year.

27.     At no time did ZINEB receive or have access to substantial independent sources of income or wealth apart from public funds and other state assets of the Gambian government.

---

[3] The Dalasi is the official currency of The Gambia.  The conversion rate as of July 14, 2020 is approximately 51.56 Gambian Dalasi per one USD.

28.     During his tenure in office, JAMMEH accumulated at least 281 known landed properties registered in his name or in companies and foundations in which he has shares or an interest; and he operated over 100 private bank accounts directly or through the aforesaid companies or foundations.  Neither JAMMEH nor his wife ZINEB appear to have family wealth to explain how he acquired these assets.

## II.     JAMMEH's Pattern of Corruption and Bribes

29.     JAMMEH's pattern of corruption included soliciting and extorting bribes from businesses operating in The Gambia and causing funds to be withdrawn in cash from The Gambia's Central Bank with little or no paperwork to describe or justify the use of these public funds.   For example, JAMMEH granted monopoly rights to businesses over lucrative sectors of the Gambian economy, e.g., fuel importation and telecommunication rights, in exchange for bribes and kickbacks.  Although these monopoly rights were granted for a period of years, JAMMEH would periodically and repeatedly threaten to rescind these rights from their custodians unless these businesses paid him further bribes and kickbacks.

### A.  JAMMEH Received Corrupt Payments From Petroleum Company

30.     Petroleum Company, a company controlled by Businessman #1, was granted exclusive monopoly rights by JAMMEH over all petroleum imports into The Gambia.  In July 2010, however, Petroleum Company was informed by its petroleum supplier that its monopoly over fuel imports into The Gambia would cease at the end of 2010.  In seeking to reverse this decision, on or about July 30, 2010, Businessman #1 requested that JAMMEH issue a letter confirming Petroleum Company's continued monopoly rights over The Gambia's petroleum imports through 2014.

31.     On August 10, 2010, bank records for Petroleum Company at Trust Bank Ltd. show the equivalent of $1,000,000 USD in Dalasi being transferred out of its account.

32.     That same day, August 10, 2010, Businessman #1 received a letter from Secretary General Mustapha Yarbo, a Gambian official on JAMMEH's presidential staff, confirming Petroleum Company's continued monopoly rights over the Gambian petroleum importation industry.  The letter informed Businessman #1, "His Excellency has endorsed your request to continue as the sole government appointed agent for the importation of fuel into The Gambia until 2014 in accordance with the agreement."

33.     Petroleum Company was found to have engaged in a series of corrupt payments to JAMMEH, both on its own behalf as well as that of others, including Businessman #2:

> The Commission found based on records of funds that were deposited into bank accounts that between March 6, 2013 and November 19, 2013, Petroleum Company made five bribe payments to JAMMEH totaling USD2,550,000 in order to maintain its monopoly rights in The Gambia and in direct response to JAMMEH's threats to revoke the company's exclusive contracts.

**B.  JAMMEH Also Received Corrupt Payments from Telecommunications Companies in The Gambia**

34.     Telephone Management Services Firm, a legal entity owned by Businessman #2, was a company retained by The Gambia to provide telecommunications services in The Gambia, including international telephone and internet services, beginning in or about 2007.  Businessman #1 continued to function as an intermediary between JAMMEH and Telephone Management Services Firm.

35.     The Commission found that in or about 2007, JAMMEH approved the Gambian government's sale of fifty percent of the shares of Company GAMTEL a state-owned telecommunications enterprise, and its subsidiary to Telephone Management Services Firm for $35 million USD.  This was a small fraction of Company GAMTEL's actual market value.

36.     At about the same time, The Gambia also entered into a multi-year contract for management and other services, including international telephone and internet services, with

another entity held by Telephone Management Services Firm.  Businessman #2 is alleged by others to have had no prior experience in the telecommunications field at the time his company was awarded this contract.

37.     In or about 2008, JAMMEH caused The Gambia to terminate its agreement with Telephone Management Services Firm.  Although Businessman #2 requested that the Gambian Government return the $35 million USD he paid to The Gambia for Company GAMTEL's shares, only $5 million USD was repaid by the Ministry of Finance to Businessman #2.

38.     In or around 2011, after Businessman #1 intervened on Businessman #2's behalf, JAMMEH agreed to allow Businessman #2 to resume management services work in The Gambia under a new name, Successor Telephone Services Management Firm, pursuant to a new contract signed and dated on or about April 8, 2011.  The new contract was signed this time by the Secretary General of The Gambia rather than the state-owned companies previously responsible for overseeing such services.

39.     JAMMEH's office took over all oversight of the contract with Businessman #2. JAMMEH's office also issued instructions to Successor Telephone Services Manager to pay all proceeds due in the future to the Gambian government into a new bank account established at the Central Bank of Gambia.  The Secretaries General and Cabinet Secretaries became signatories to this account.  Bank records show $5,026,805 USD was deposited into this account.  JAMMEH then proceeded to spend these funds for his personal use.

40.     As noted above in Paragraph 33, the Commission found that Petroleum Company made corrupt payments to JAMMEH on behalf of corrupt businessmen, including Businessman #2.  Specifically, the Commission determined that:

Based on records of funds that were deposited into bank accounts, between June 30, 2011 and January 2013, Petroleum Company and its officers paid or facilitated the payment of over **USD7,514,000 (D240,280,000.00)** in bribes to JAMMEH.  Businessman #1 did not dispute these payments, but testified to the Commission that the payments were actually made on behalf of Businessman #2 so that his **Telephone and Internet Services Management Firm** would be allowed to conduct business in The Gambia.

### III.     The Purchase of the Defendant Property

41.     In or about 2010, a real estate broker in the United States was advised that a large house was sought for purchase in the Washington, D.C. area for the use of the family of ZINEB JAMMEH and her staff. The broker provided information about homes for sale, including the Defendant Property in Potomac, Maryland.

42.     On or about August 8, 2010, records show ZINEB settled the MYJ Family Revocable Trust and executed a Certificate of Trust Existence and Authority.  An employee of Petroleum Company signed the Certificate of Trust as a witness and provided his business address as the address for the MYJ Family Revocable Trust and his email address as the point of contact for the real estate transaction.

43.     On or about August 11, 2010, according to Trust Bank Ltd. records, an employee of Petroleum Company opened an account at Trust Bank Ltd. in Banjul, The Gambia in the name of the MYJ Family Trust.  This was one day after Petroleum Company received a re-affirmance of their fuel importation monopoly rights, one day after it transferred $1,000,000 USD from its account at Trust Bank Ltd., and while Businessman #2 was seeking to re-establish the Telecommunication and Internet Services Management Firm's contract with the Gambian government.

44.     On or about August 13, 2010, according to Trust Bank Ltd. records, an employee of Petroleum Company and associate of Businessman #1 deposited bulk cash in U.S. currency into

the MYJ Family Trust account in three separate transactions: $800,000; $125,000; and $75,000.

In total, the Petroleum Company employee caused approximately $1,000,000 USD in cash to be

deposited into the MYJ Family Trust account that day.

45.     On or about August 18, 2010, $1,000,000 USD was transferred via wire from the

MYJ Family Trust account to an account at Wachovia Bank in Bethesda, Maryland in the name of

Paragon Title and Escrow Company, a real estate title and escrow company operating in Maryland.

46.     The transactions to fund the purchase of the Defendant Property included:

| DATE | TRANSACTION | AMOUNT (USD) |
|---|---|---|
| August 13, 2010 | Cash deposited into MYJ Family Trust account number 1201111798401, Trust Bank Ltd., Banjul, The Gambia | **$800,000** |
| August 13, 2010 | Cash deposited into MYJ Family Trust account number 1201111798401, Trust Bank Ltd., Banjul, The Gambia | **$125,000** |
| August 13, 2010 | Cash deposited into MYJ Family Trust account number 1201111798401, Trust Bank Ltd., Banjul, The Gambia | **$75,000** |
| August 18, 2010 | Wire transfer from MYJ Family Trust to Paragon Title and Escrow Company in Bethesda, MD. Deposit made into Wachovia Account: xxxxx9477. | **$1,000,000** |
| August 20, 2010 | Cash deposited into MYJ Family Trust account number 1201111798401, Trust Bank Ltd., Banjul, The Gambia | **$1,000,000** |
| August 23, 2010 | Cash deposited into MYJ Family Trust account number 1201111798401, Trust Bank Ltd., Banjul, The Gambia | **$500,000** |
| August 25, 2010 | Wire transfer from MYJ Family Trust to Paragon Title and Escrow Company in Bethesda, MD. Deposit made into Wachovia Account: xxxxx9477. | **$1,500,000** |
| September 2, 2010 | Cash deposited into MYJ Family Trust account number 1201111798401, Trust Bank Ltd., Banjul, The Gambia | **$1,000,000** |
| September 7, 2010 | Wire transfer from MYJ Family Trust to Paragon Title and Escrow Company in Bethesda, MD. Deposit made into Wachovia Account: xxxxx9477 | **$1,000,000** |

| DATE | TRANSACTION | AMOUNT (USD) |
|------|-------------|--------------|
| September 8, 2010 | Wire transfer from MYJ Family Trust to Paragon Title and Escrow Company in Bethesda, MD.  Deposit made into Wachovia Account: xxxxx9477 | **$62,610** |

47.     After approximately $3,562,610 USD was wired from the MYJ Family Trust account in August and September 2010 to Paragon Title and Escrow Company in Bethesda, Maryland, the MYJ Family Trust account, at Trust Bank Ltd. in The Gambia possessed a negative balance.  On or about September 16, 2010, approximately $4,000 USD in additional funds were transferred from Petroleum Company's account to the MYJ Family Trust account.  These funds were used to reconcile the MYJ Family Trust account's negative balance.

48.     On September 20, 2010, the Defendant Property was purchased in the name of the MYJ Family Trust for $3,500,000 USD, plus $62,610 USD in closing costs.  In furtherance of the transaction, a deed for the Defendant Property was issued to the trustees of the MYJ Family Trust.

49.     After the Defendant Property was purchased, upon information and belief, ZINEB and JAMMEH's children attended schools in the Washington, D.C. area and ZINEB occasionally traveled to the area, employing a household staff to maintain the Defendant Property when she was not there.

**IV.     The Gambian Criminal Code Prohibits the Theft of Public Funds, the Receipt of Bribes by Public Officials, and Money Laundering**

50.     The Gambian Criminal Code outlaws the theft of public funds and the receipt of bribes and kickbacks by public officials.  See Gambian Criminal Code, sections 245, *et seq.* (offense of theft) and 360-361 (offenses including bribery and embezzlement).  The Gambia criminalized money laundering in the Anti Money Laundering Act of 2003. A copy of the relevant portions of the Gambian law are attached hereto as **Exhibit 1.**

## FIRST CLAIM FOR FORFEITURE

51.     The United States incorporates by reference ¶¶ 1 through 50 above as if fully set forth herein.

52.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States.

53.     "Specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); and (v) wire fraud (18 U.S.C. § 1343).

54.     As set forth above, the Defendant Property constitutes or is derived from proceeds traceable to bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of The Gambia, as well as from proceeds traceable to (i) the interstate transportation or receipt of property stolen or taken by fraud, (ii) wire fraud, or (iii) a conspiracy to commit one of the foregoing offenses.

55.     Therefore, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

56.    The United States incorporates by reference ¶¶ 1 through 50 above as if fully set forth herein.

57.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property" is subject to forfeiture to the United States.

58.    Title 18, United States Code, Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."

59.    For purposes of section 1957, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); and (v) wire fraud (18 U.S.C. § 1343).

60.    As set forth above, the Defendant Property was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, including bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of The Gambia; the interstate transportation or receipt of property stolen or taken by fraud; wire fraud; or a conspiracy to commit one of the foregoing offenses.

61.     Therefore, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957.

### THIRD CLAIM FOR FORFEITURE

62.     The United States incorporates by reference ¶¶ 1 through 50 above as if fully set forth herein.

63.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

64.     Title 18, United States Code, Section 1956(a)(1) imposes criminal penalties on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity --

> . . .

> (B) knowing that the transaction is designed in whole or in part --

> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

65.     For purposes of section 1956, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); and (v) wire fraud (18 U.S.C. § 1343).

66.     As set forth above, the Defendant Property was involved in, or is traceable to, financial transactions or attempted financial transactions involving funds derived from specified unlawful activity, including bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of The Gambia; the interstate transportation or receipt of property stolen or taken by fraud; wire fraud; or to a conspiracy to commit one of the foregoing offenses.

67.     As further set forth above, the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity by, among other things, the use of sham trusts to conceal JAMMEH's ownership and control of the Defendant Property.

68.     Therefore, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) or is traceable to such property.

## FOURTH CLAIM FOR FORFEITURE

69.     The United States incorporates by reference ¶¶ 1 through 50 above as if fully set forth herein.

70.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

71.     Title 18, United States Code, Section 1956(a)(2) imposes criminal penalties on any person who:

> Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States --

. . .

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part --

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

72.     For purposes of section 1956, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); and (v) wire fraud (18 U.S.C. § 1343).

73.     As set forth above, the Defendant Property was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States or to a place outside the United States from or through a place in the United States, in which such funds were derived from specified unlawful activity, including bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of The Gambia; the interstate transportation or receipt of property stolen or taken by fraud; or a conspiracy to commit one of the foregoing offenses.

74.     As further set forth above, such transportation, transmissions, or transfers were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity by, among other things, the use of cash

deposits routed through sham trust accounts to conceal the source of funds and JAMMEH's ownership and control of the Defendant Property.

75.     Therefore, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(2)(B)(i) or is traceable to such property.

## FIFTH CLAIM FOR FORFEITURE

76.     The United States incorporates by reference ¶¶ 1 through 50 above as if fully set forth herein.

77.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property" is subject to forfeiture to the United States.

78.     Title 18, United States Code, Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. § 1956 or 1957]."

79.     As set forth above, the Defendant Property was involved in or was the subject of a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and/or 1957, which transactions involved the proceeds of, or property traceable to the proceeds of, specified unlawful activity, including, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); and (v) wire fraud (18 U.S.C. § 1343).

80.     Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) on the grounds that it constitutes property involved in a conspiracy

or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h) or is traceable to such property.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff, the United States requests as follows:

(1)     that the Court enter judgment against the Defendant Property, and in favor of the United States, on all claims alleged in the Complaint.

(2)     that the Court issue process to enforce the forfeiture of the Defendant Property, requiring all persons having an interest in the Defendant Property be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Property to the United States of America for disposition according to law; and

(3)     that the Court grant the United States such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: July 15, 2020

Respectfully submitted,

Robert K. Hur
United States Attorney
District of Maryland

By:    _/s/_____
Jennifer L. Wine
Assistant United States Attorney


Deborah L. Connor, Chief
Money Laundering and Asset Recovery Section (MLARS)
Criminal Division, U.S. Department of Justice

By:    _/s/_____
Steven C. Parker
Kaycee M. Sullivan
Trial Attorneys, MLARS-International Unit

Attorneys for Plaintiff
United States of America

## VERIFICATION

I, Andrea C. Randou, a Special Agent with Homeland Security Investigations, declare under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement agents or officials from the government of The Gambia, and that everything represented herein is true and correct.

Executed on this 15th day of July 2020.

Andrea C. Randou
Special Agent
Homeland Security Investigations