**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CIVIL NO. DKC-20-2071** |
| | * | |
| **REAL PROPERTY LOCATED IN** | * | |
| **POTOMAC, MARYLAND,** | * | |
| **COMMONLY KNOWN AS 9908** | * | |
| **BENTCROSS DRIVE, POTOMAC, MD** | * | |
| **20854 AND ALL APPURTENANCES,** | * | |
| **IMPROVEMENTS, AND** | * | |
| **ATTACHMENTS LOCATED** | * | |
| **THEREON, AND ALL RENTAL AND** | * | |
| **OTHER INCOME GENERATED BY** | * | |
| **THE PROPERTY, OR ANY** | * | |
| **PROPERTY TRACEABLE THERETO,** | * | |
| | * | |
| **Defendant *In Rem*.** | * | |
| | * | |

**\*\*\*\*\*\*\***

**UNITED STATES' SUPPLMENTAL MEMORANDUM IN SUPPORT OF**
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**
**AND FINAL ORDER OF FORFEITURE**

The United States of America, by and through its undersigned counsel, files this supplemental memorandum in support of its motion (ECF No. 15, the "Motion"), pursuant to Federal Rule of Civil Procedure 55(b)(2), for entry of a Default Judgment in Plaintiff's favor and a Final Order of Forfeiture against the above-named property (the "Defendant Property") on the grounds set forth in the Verified Amended Complaint for Forfeiture *In Rem* (the "Amended Complaint"). In support of the Motion, the United States submits the following:

**BACKGROUND**

1. On August 25, 2020, the United States filed the Amended Complaint seeking forfeiture of the Defendant Property to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A) and

(a)(1)(C), because it constitutes, is derived from, or is traceable to the proceeds of "specified unlawful activity," as that term is defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit a "specified unlawful activity," and is property involved in money laundering violations of 18 U.S.C. §§ 1956 and 1957.  Specifically, the Defendant Property was acquired through the MYJ Family Trust , a trust established by the former President of The Gambia, Yahya Jammeh ("Jammeh"), and his wife, Zineb Jammeh (together, the "Jammehs"), using proceeds derived from illicit activity, including bribes and stolen public funds misappropriated in violation of U.S. and Gambian law.  *See* ECF No. 6.

2.      As set forth in the Motion, the United States has complied with the notice and service requirements set forth in 18 U.S.C. § 985 and Rule G(4) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules") for this *in rem* forfeiture action.  ECF No. 15, ¶¶ 4-19.  The United States attempted to serve notice of the Amended Complaint on the Jammehs in Equatorial Guinea, where they are believed to be living in exile, through "internationally agreed means of service. . . reasonably calculated to give notice." Fed. R. Civ. P. 4(f)(1).  After extensive efforts to provide notice and service, no person or entity has filed a claim to the Defendant Property or appeared to contest the forfeiture of the Defendant Property (or to request an extension to the claims deadlines) and the time to do so has expired.  *See* ECF No. 15, ¶¶ 20-21 (listing claims deadlines pursuant to Supplemental Rule G(5)(a)).

3.      On May 26, 2021, the Court entered a Clerk's Entry of Default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.  ECF No. 11.

4.      On September 1, 2021, the Court granted the United States' Motion to Permit Alternative Service, pursuant to 18 U.S.C. § 985(c)(2) and Maryland Rule 2-121(c), deeming the property owner to have been served by alternate service no later than March 4, 2021, when a copy

of the notice and Amended Complaint were delivered to the address listed in the trust documents for Zineb Yahya Jammeh, as Trustee for the MYJ Family Revocable Trust.  ECF No. 14.

5.     On September 29, 2021, the United States filed a Motion for Default Judgment and Final Order of Forfeiture. ECF No. 15. In further support of the Motion, the United States submits this supplemental briefing.

## APPLICABLE LAW

6.     Although the Fourth Circuit has a "strong policy that cases be decided on their merits," *United States v. Shaffer Equip. Co.*, 11 F.3d 450,453 (4th Cir. 1993), default judgment may be appropriate "when the adversary process has been halted because of an essentially unresponsive party." *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).  Nonetheless, "[a] defendant's default does not automatically entitle the plaintiff to entry of a default judgment:  rather, that decision is left to the discretion of the court."  *Choice Hotels Int'l, Inc. v. Savannah Shakti Corp.*, No. DKC-11-0438, 2011 U.S. Dist. LEXIS 123162, *2 (D. Md. Oct. 25, 2011) (*citing Dow v. Jones*, 232 F. Supp. 2d 491, 494 (D. Md. 2002)).

7.     In determining whether to grant default judgment under Fed. R. Civ. P. 55(b), the court accepts as true the well-pleaded factual allegations in the complaint.  *Ryan v. Homecomings Fin. Network*, 253 F.3d 778,780-81 (4th Cir. 2001).  However, it remains for the court to "consider whether these unchallenged factual allegations constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law."  *United States v. 50.44 Bitcoins*, No. ELH-15-3694, 2016 U.S. Dist. LEXIS 70404, *2-3 (D. Md. May 31, 2016) (Sullivan, J., issuing report and recommendation on referral of motion for default judgment).

8.      "Civil forfeiture complaints must 'state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.'"  *United States v. $85,000 in U.S. Currency*, No. WDQ-10-371, 2011 U.S. Dist. LEXIS 28809, at *2 (D. Md. Mar. 21, 2011) (quoting Fed. R. Civ. P. Supp. R. G(2)(f)).  Supplement Rule G(2)(f) does not, however, require the Government to establish the forfeitability of the defendant property by a preponderance of evidence, "[r]ather, the Court reviews the complaint for facts sufficient to 'support a reasonable belief' that the Government will be able to prove forfeitability *at trial* by a preponderance of the evidence." *United States v. One 2003 Mercedes Benz CL500*, No. PWG-11-3571, 2013 U.S. Dist. LEXIS 143041, *7 n.4 (D. Md. Oct. 3, 2013) (quoting Fed. R. Civ. P. Supp. R. G(2)(f)).  In order to prevail on a motion for default judgment in a civil forfeiture case, such as this one, the Government need only set forth sufficient facts to support a "reasonable belief" that it would "be able eventually to prove the grounds of forfeiture by a preponderance of the evidence." *United States v. $3,156.00 in U.S. Currency*, No. L-10-1128, 2010 U.S. Dist. LEXIS 120460, *2-3 (D. Md. Nov. 15, 2010).  The Government may use "evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that the [defendant] property is subject to forfeiture."  18 U.S.C. § 983(c)(2); *see 2003 Mercedes*, 2013 U.S. Dist. LEXIS 143041, *43 (allowing Government to supplement motion for default judgment with additional facts supporting the connection between the defendant property and the alleged criminal offenses).

9.      Where, as in this case, one of the Government's theories of forfeiture is that the defendant property was "involved in the commission of a criminal offense" (*e.g.*, money laundering), the Government must "establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c)(3); *see also United States v. $12,735.53 in U.S.*

*Currency*, No. GJH-15-3475, 2016 U.S. Dist. LEXIS 157587, *7 (D. Md. Nov. 14, 2016) (finding the Government had established a "substantial connection" between the defendant currency and the alleged wire fraud and money laundering scheme based on the facts alleged in the complaint and supporting declaration). "The hurdle imposed by the 'substantial connection' requirement is not . . . a particularly high one." *United States v. One 2003 Mercedes Benz* CL 500, No. PWG-11-3571, 2013 U.S. Dist. LEXIS 98506, *12 (D. Md. July 15, 2013) (quoting *United States v. 998 Cotton Street, Forsyth County, N.C.*, No. 11-CV-356, 2013 U.S. Dist. LEXIS 40028, at *34 (M.D.N.C. Mar. 22, 2013) and *United States v. Borromeo*, 995 F.2d 23, 26 (4th Cir. 1993)). The Court may draw "reasonable inferences . . . from the evidence presented to establish a nexus between the [Defendant Property] and the [criminal] activity." *Id*. "Although the property need not be integral, essential, or indispensable to criminal activity, it still must have more than an incidental or fortuitous connection to criminal activity." *Id.* (internal quotations omitted).

## ARGUMENT

10. The well-pleaded factual allegations of the verified Amended Complaint (for which no denials or contrary assertions have been made) "support a reasonable belief" that the United States would be able to prove the forfeitability of the Defendant Property by a preponderance of the evidence at trial. *See* Fed. R. Civ. P. Supp. R. G(2)(f). Specifically, the Amended Complaint alleges that the Defendant Property was acquired with proceeds derived from illicit bribes and stolen public funds misappropriated by the former President of Gambia and his wife. Therefore as alleged in the Amended Complaint, the Defendant Property is forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C) because it constitutes, is derived from, or is traceable to the proceeds of "specified unlawful activity," as that term is defined in 18 U.S.C. § 1956(c)(7),[1] or a conspiracy

---

[1] As set forth in the Amended Complaint, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A), (c)(7)(B)(iv), and (c)(7)(D) to include, among other things: (i) foreign offenses

to commit "specified unlawful activity," and is property involved in money laundering violations of 18 U.S.C. §§ 1956 and 1957.  ECF No. 6 at ¶ 1.

11.     The Amended Complaint contains a lengthy statement of facts "sufficiently detailed . . . to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Supp. Rule G(2)(f); *see* ECF No. 6, ¶¶ 24-51 and ¶¶ 4-10.  As required by Supplemental Rule G(2)(A), the Amended Complaint was verified by Homeland Security Investigations Special Agent Andrea Randou, who attested under penalty of perjury that the factual allegations contained therein are "based upon reports and information known to [her] and/or furnished to [her] by other law enforcement agents or officials from the government of The Gambia, and that everything represented [t]herein is true and correct."  ECF No. 6 at 23.

12.     As an initial matter, the Amended Complaint alleges that Jammeh had insufficient lawful income—first as a lieutenant in the Gambian military and later as the President of The Gambia—to support the Jammehs' lifestyle and extensive asset acquisitions, including the $3.5 million cash purchase of the Defendant Property in 2010—one of at least 281 known landed properties in which the Jammehs had an interest.  *See id.*, ¶¶ 24-29.  In particular, in the two years Jammeh served as President of The Gambia prior to the purchase of the Defendant Property, Jammeh was paid approximately $39,540 USD per year.  *See id.,* ¶ 26.  Even assuming that

---

involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); and (v) wire fraud (18 U.S.C. § 1343).  ECF No. 6, ¶54.  As set forth in the Amended Complaint, the quasi-judicial commission appointed to investigate Jammeh's public corruption concluded that Jammeh and his associates were criminally liable for violations of numerous sections of The Gambia's Criminal Code, including theft (§ 245) and public corruption offenses including bribery and embezzlement (§§ 360-361).  The Janneh Commission also concluded that the purchase of the Defendant Property was more likely than not a violation of The Gambia's Anti-Money Laundering Act of 2003.  *Id.*, ¶8.

Jammeh was able to save 100% of his income, at this annual salary, it would have taken him approximately 88.5 years to fund the $3.5 million purchase of the Defendant Property.

13.     Judges in this district have granted default judgment in civil forfeiture cases based upon a showing of lack of sufficient legitimate income to support ownership or possession of specific property.  *See, e.g.*, *United States v. One 2003 Mercedes Benz CL500*, No. PWG-11-3571, 2014 U.S. Dist. LEXIS 174619, *2-3 (D. Md. Dec. 17, 2014) (granting renewed motion for default judgment based upon the Government's supplemental declaration alleging that the vehicle owner lacked sufficient legitimate income to support the purchase of the vehicle); *see also 2003 Mercedes-Benz*, 2013 U.S. Dist. LEXIS 143041, *18-21 (surveying civil forfeiture cases granting default judgment in this district and noting that one factor consistently present was "no wage history or minimal wages that were disproportionate to the amount of currency seized"); *United States v. $3,156.00 in U.S Currency*, Civil No. 10-cv-01128-BEL (D. Md.) (Legg, J.), ECF Nos. 10 and 11 (entering order of forfeiture following Government's submission of supplemental declaration asserting that the individual's possession of $3,156 was inconsistent with his reported legitimate weekly earnings of $523.58 per week).

14.     The Amended Complaint details Jammeh's pattern of corruption, including his withdrawal of cash from The Gambia's Central Bank with little or no supporting paperwork.  *Id.,* ¶30.  The Amended Complaint cites a September 2019 report prepared by the quasi-judicial commission established by the Gambian government to investigate the Jammeh regime's public corruption (the "Janneh Commission") which found that Jammeh "misappropriated, diverted, or simply stole the equivalent of over $300 million U.S. dollars from public accounts." *Id.,* ¶¶6-7.

15.     Additionally, as alleged in the Amended Complaint, as part of his pattern of corruption Jammeh granted exclusive contracts and monopoly rights to businesses over lucrative

sectors of the Gambian economy, e.g., fuel importation and telecommunication rights, in exchange for bribes and kickbacks. *Id.*, ¶30. The Amended Complaint details two specific instances of Jammeh receiving bribes and kickbacks: (1) from Petroleum Company, a company controlled by Businessman #1, that was granted exclusive monopoly rights by Jammeh over all petroleum imports into The Gambia (*id.*, ¶¶31-34); and (2) from Telephone Management Services Firm, a company owned by Businessman #2, that was retained by The Gambia to provide telecommunications services.(*id.*, ¶¶34-40). As outlined in the attached Declaration of Special Agent Andrea C. Randou (the "Randou Declaration"), documentary evidence of these transactions was provided to the United States by the government of The Gambia.

16.     As alleged in the Amended Complaint, in July 2010, Petroleum Company was notified by its petroleum supplier that it would be losing its exclusive monopoly rights in The Gambia. *Id.,* ¶31. On or about July 30, 2010, Businessman #1 requested that Jammeh issue a letter confirming Petroleum Company's continued monopoly rights over The Gambia's petroleum exports through 2014. Eleven days later, on or about August 10, 2010, Petroleum Company's monopoly rights were reaffirmed after the equivalent of approximately $1,000,000 USD in Gambian currency was transferred out of Petroleum Company's bank account. *Id.,* ¶¶32-33. *See* Randou Declaration at Ex. 4.

17.     The Amended Complaint notes the link between the timing of this transaction and the purchase of the Defendant Property. Specifically, the Amended Complaint alleges that, on or about August 11, 2010, just one day after the Petroleum Company's monopoly rights were reaffirmed, an employee of the Petroleum Company opened an account at Trust Bank Ltd. in Banjul, The Gambia in the name of the MYJ Family Trust, the owner of the Defendant Property. *Id.,* ¶ 44. Two days later, on or about August 13, 2020, that employee deposited approximately

Case 8:20-cv-02071-DKC   Document 16   Filed 03/28/22   Page 9 of 13

$1,000,000 in U.S. currency into the MYJ Family Trust account at Trust Bank in a series of three transactions. *Id.,* ¶ 45. Five days later, $1,000,000 in U.S. currency was wired from the MYJ Family Trust account in The Gambia to a Wachovia Bank account held by Paragon Title and Escrow Company, a real estate title and escrow company in Bethesda, Maryland, in order to fund the purchase of the Defendant Property.[2] *Id.,* ¶ 46.

18.    Over the next five days, on or about August 20, 2010 and August 23, 2010, another $1.5 million in cash was deposited to the MYJ Family Trust account at Trust Bank. On or about August 25, 2010, the $1.5 million was wired from the MYJ Family Trust account to Paragon Title and Escrow Company in Maryland. On or about September 2, 2010, another $1 million in cash was deposited into the MYJ Family Trust account at Trust Bank in The Gambia. Five days later, on or about September 7, 2010, the $1 million was wired from the MYJ Family Trust account to Paragon Title and Escrow. *Id.*, ¶47.

19.    Similarly, Jammeh received corruption proceeds from another source prior to the purchase of the Defendant Property in 2010. Telephone Management Services Firm, a legal entity owned by Businessman #2, was a company retained by The Gambia to provide telecommunications services in The Gambia, including international telephone and internet services, beginning in or about 2007. Businessman #1 continued to function as an intermediary between Jammeh and Telephone Management Services Firm. The Commission found that in or about 2007, Jammeh approved the Gambian government's sale of fifty percent of the shares of the Gamtel, a state-owned telecommunications enterprise, and its subsidiary to Telephone Management Services Firm for $35 million USD. This was a small fraction of Gamtel's actual

---

[2] As set forth in the Randou Declaration attached hereto, Paragon Title and Escrow Company is the title company listed on the Deed evidencing the transfer of the Defendant Property to the MYJ Family Trust. Randou Declaration at Ex. 5.

market value.  At about the same time, the Gambian government also entered into a multi-year contract for "management and other services," including international telephone and internet services, with another entity held by Telephone Management Services Firm.  In or about 2008, Jammeh caused the Gambian government to terminate its agreement with Telephone Management Services Firm.  Although Businessman #2 requested that the Gambian government return the $35 million USD he paid for Gamtel's shares, only $5 million USD was repaid by the Ministry of Finance to Businessman #2, with the remaining $30 million unaccounted for by the Jammeh regime.  *See* Randou Declaration ¶8 and Ex. 2.

20.     The facts alleged in the Amended Complaint and supported by the documentary evidence attached as exhibits to the Randou Declaration establish a "substantial connection" between the Defendant Property and the alleged money laundering offenses and "support a reasonable belief" that the Government would be able to prove the forfeitability of the Defendant Property at trial by a preponderance of the evidence.  Specifically, as alleged in the Amended Complaint, proceeds derived from illicit activity, including bribes and stolen public funds misappropriated in violation of U.S. and Gambian law, were used to purchase the Defendant Property.  *See id.,* ¶4.

21.     The Jammehs have exiled themselves in Equatorial Guinea and have not responded to the allegations in the Amended Complaint or otherwise appeared to contest these proceedings. As such, the well-pleaded allegations of the Amended Complaint should be deemed to be true, *Ryan*, 253 F.3d at 780, and should be determined to be "sufficiently detailed to support a reasonable belief" that the United States would be able to prove the forfeitability of the Defendant Property by a preponderance of the evidence at trial.

22.     Accordingly, upon consideration of the record in this case, including a showing of compliance with Supplement Rule G, and a default having been entered by the Clerk of Court, the United States requests that the Court find that United States has alleged factual allegations sufficient to support a reasonable belief that the United States would be able to meet its burden to prove the forfeitability of the Defendant Property by a preponderance of the evidence at trial and exercise its discretion to enter a default judgment pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure.  Moreover, to ensure that the United States has clear title to the Defendant Property and has the authority to dispose of the Defendant Property in accordance with law, the government also seeks the entry of a Final Order of Forfeiture.

WHEREFORE, the United States requests the entry of the proposed Default Judgment and Final Order of Forfeiture, submitted herewith, transferring title of the Defendant Property to the United States and directing the Attorney General to dispose of the Defendant Property according to law.

Respectfully submitted,

Erek L. Barron
United States Attorney

*/s/ Jennifer L. Wine*
Jennifer L. Wine
Assistant United States Attorney

Deborah L. Connor, Chief
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice

By:   */s/ Kaycee M. Sullivan*
Kaycee M. Sullivan
Steven C. Parker
Trial Attorneys, International Unit

Attorneys for Plaintiff
United States of America

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing United States' Supplemental Memorandum in Support of Motion for Entry of a Default Judgment and Final Order of Forfeiture, as well as the proposed Default Judgment and Final Order of Forfeiture, were filed through the Electronic Case Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.  In addition, I caused a copy of the Supplemental Memorandum and proposed order to be served by certified and first class postage prepaid to:

Trustees of the MYJ Family Revocable Trust
9908 Bentcross Drive
Potomac, Maryland 20854

Zinyeb Jammeh
Trustee of the MYJ Family Revocable Trust
13250 Rotunda Drive
Dearborn, Michigan 48120

Trustees of the MYJ Family Revocable Trust
c/o Goldberg Group Property Management &
Real Estate
9711 Washingtonian Blvd, #125
North Potomac, Maryland 20878

Trustees of the MYJ Family Revocable Trust
c/o H&C Services Inc.
2400 Glebe Rd. #329
Arlington, Virginia 22206

Trustees of the MYJ Family Revocable Trust
c/o H&C Services Inc.
6311 Telegraph Rd.
Alexandria, Virginia 22310

Trustees of the MYJ Family Revocable Trust
c/o H&C Services Inc.
P.O. Box 11557
Alexandria, VA 22312

Trustees of the MYJ Family Revocable Trust
c/o Mazagan Restaurant
Riyad Bouizar
5620 Ravenel Lane
Springfield, Virginia 22151

Trustees of the MYJ Family Revocable Trust
c/o Caspi Restaurant & Lounge (f/k/a Mazagan
Restaurant)
2901 Columbia Pike
Arlington, Virginia 22204

Trustees of the MYJ Family Revocable Trust
c/o Sashika Salgado
9031 Chesley Knoll Ct. #C
Gaithersburg, Maryland 20879

Trustees of the MYJ Family Revocable Trust
c/o Sashika Salgado
13 Mallory Court
Gaithersburg, Maryland 20879

Trustees of the MYJ Family Revocable Trust
c/o Anouar Esslami
1075 South Jefferson Street, Apt. 62
Arlington, Virginia 22204

Trustees of the MYJ Family Revocable Trust
c/o Venable, LLP
600 Massachusetts Ave., NW
Washington, DC 20001

Trustees of the MYJ Family Revocable Trust
c/o Mohammed Boumediane
5550 Columbia Pike, Apt. 491
Arlington, Virginia 22204

*/s/ Jennifer L. Wine*
Jennifer L. Wine
Assistant United States Attorney

13